Bulow *vs.* Witte.

---

HEARD APRIL TERM, 1871.

## Bulow *vs.* Witte.

Under a petition, filed in 1859 by trustees, for the sale of real and personal estate of two infants, aged twelve and ten years, named in the petition, but not as parties thereto, an order was made directing a master "to assign a guardian *ad litem* to the infants to appear to this petition." The Master made an order appointing the mother of the infants, with her consent, their guardian *ad litem*—the order reciting that "the minors being brought into Court, and selecting their mother," &c., but neither the petition, nor a subpœna *ad respondendum*, was served on the infants, nor was an answer put in for them. The petition was then referred to a Master to report on the facts, and whether a sale would be to the advantage of the infants, and on his report coming in recommending a sale—in the propriety of which, as the report stated, the guardian *ad litem* of the infants concurred—it was confirmed, and a decree for sale made. On bill filed by the infants against the purchaser of the real estate under the decree : *Held*, That the infants had been made parties to the petition and were concluded by the decree.

Under the former system of equity procedure, there was no prescribed mode of making an infant a party defendant except his appearance by a guardian *ad litem*, appointed by the Court for that purpose—neither service of a *subpœna ad respondendum* on the infant, nor an answer put in by him, was essential, though both were usual.

Decree in Equity, in March, 1859, for sale of infants' real estate, to be made by a Master "at such time and place, and on such terms as he, with the advice of the trustees" of the infants, "might approve." The sale was made in June, 1862; *Held*, That the sale was not void merely because the Master received payment from the purchaser in Confederate currency.

A sale of real estate of infants was made by a Master, at public auction, in June, 1862, under a decree which gave no direction as to advertising. It was advertised in a newspaper for a period less than one week before it was made: *Held*, That the sale was not irregular and void.

A sale in June, 1862, by a Master in Equity, was not irregular because the decree for sale made in March, 1859, and renewed in March and November, 1860, had not been renewed within a year and a day before the sale.

A sale of the real estate of infants, made by a Master in Equity in June, 1862, under a decree made in March, 1859, and continued by an order of March, 1860, and again continued by an order of November, 1860, was not void because the decree had not been renewed as directed by Section 4 of the Act of December, 1861, commonly called the Stay Law.

BEFORE CARPENTER, J., AT CHARLESTON, APRIL TERM, 1870.

This was a bill in Equity by Thomas Leonel Bulow, and John Charles Bulow a minor, by his next friend, plaintiffs, against Chas. O. Witte, defendant. Its object was to obtain a decree setting aside the sale to the defendant, made June 3d, 1862, by a Master of the Court, of the Long Savannah plantation, hereinafter more particularly mentioned.

The facts of the case are stated in a report of Master Tupper, dated 13th of March, 1867, made under a bill filed by Thomas Leonel Bulow against Arthur G. Rose, surviving executor and trustee under the will of John Joachim Bulow, deceased, and John Charles Bulow. The report is as follows:

"On the 11th January, 1859, Joseph Winthrop and Arthur G. Rose, by the title and designation of Trustees under the will of John Joachim Bulow, deceased, filed a petition in this Court, (the Court of Equity for Charleston,) setting out that Mr. Bulow, on the 17th January, 1840, by his will, among other things, gave his Savannah plantation, in St. Andrew's Parish, with about two hundred negroes, to James Louis Petigru, the petitioners, and Alexander Brown, in trust for his son, Thomas L. Bulow, for life, and after his decease to his children living at the time of his death, and appointed them his executors. That the first named refused, and the others accepted the trust, and proved the will, and when the said Thomas L. Bulow came of age settled with him as executors, and let him into possession. The petitioners proceed to say that he died 15th July, 1857, leaving two sons, infants, to wit: Thomas Leonel Bulow, then of the age of twelve, and Charles Bulow, of the age of ten years; that by his will Joseph Winthrop and Thomas Lehre were appointed guardians of the children. That there were two hundred negroes, but they had not increased, and that the crops were deficient. That the petitioners

were inclined to sell the whole property, but if the land cannot be disposed of at a reasonable price, they would retain negroes enough to cultivate provisions, and cut wood for market, but that it was out of their power to cultivate the plantation in rice or cotton to any advantage. That, in fact, it would be a breach of trust in them to continue to plant, if they had power to sell. That the legal interest was in them, as they were advised, and they could lawfully sell land and the personalty with the permission of the Court, or the personalty with the permission of the Court of Ordinary. They proceeded to pray that the Court would take the case of the infants, as well as themselves, into consideration, and grant them the opportunity of proving these allegations, and sanction the sale of the whole property, or as many negroes as may be spared from the unprofitable culture of rice and cotton, according to the circumstances.

" On the 16th February, 1859, Chancellor Wardlaw ordered that it be referred to one of the Masters of this Court to assign a guardian *ad litem* to the infants, Thomas Leonel Bulow and Charles Bulow, to appear to this petition.

" On the 19th February, 1859, I reported that the minors being brought into Court, and selecting their mother, Mrs. Caroline Bulow, as their guardian *ad litem*, and the said proposed guardian also appearing in person and consenting to act, it was ordered that Mrs. Caroline Bulow be appointed guardian *ad litem* of the minors, Thomas L. and Charles Bulow.

" By my report of the 15th March, 1859, I certify that upon the evidence submitted it was manifestly for the interest of the infants that the plantations, that is to say, a plantation on Santee that belonged to the estate of Thomas L. Bulow, and the Long Savannah plantation in St. Andrew's Parish, and the negroes, be sold,* and this report was confirmed on the same day, and I was ordered to sell at such time and place, and for such terms as I, with the advice of the trustees, may approve, all the real and personal estate of John Joachim Bulow, and that the proceeds be invested in the name of Joseph A. Winthrop and Arthur G. Rose, trustees for the infants, Thomas Leonel Bulow and J. Charles Bulow, as devisees under the will of their grandfather, the said John Joachim Bulow.

" Under this decree I sold one hundred and seventy of the said slaves on the 10th and 31st January, 1860, and reported the sales to

---

*This report set forth the facts and the evidence, and stated that " Mrs. Caroline Bulow, the mother and guardian *ad litem* of the infants, concurs with the executor and trustee in the propriety of a sale of the whole property." R.

the Court on the 13th March, 1860. I further reported that the real estate consisted of a rice and cotton estate in St. Andrew's Parish, known as "Long Savannah." That no sufficient offer having been made for this property, and, with the concurrence and advice of the trustees, that I withdrew it from the sale, and, for the purpose of protecting the plantation from depredations, also reserved twenty negroes to remain upon and cultivate the provision land under the charge of the trustees, until a purchaser could be obtained for the real estate. I reported that from the cash proceeds of sale I had paid to Joseph A. Winthrop, Esq., $52,520, and he had, under my direction, invested this sum in city 6 per cent. stock in the name of himself and Arthur G. Rose, trustees of Thomas L. and J. Charles Bulow, as directed by the decree.

"On the 13th March, 1860, the report was confirmed, and the order of sale extended as to the real and personal estate unsold.

"On the 5th November, 1860, I reported that on 13th March, 1860, I had submitted a report of sales, and that I now submitted a detailed statement of all the sales and an account of receipts and disbursements, and that I had paid to the trustees, in cash, stock, and bonds, $106,201.02. I further reported that the plantation called "Long Savannah," in St. Andrew's Parish, and the twenty negroes retained thereon for its preservation, as reported on the 13th day of March, 1860, still remained unsold, no purchaser having been found for them, and I asked a further extension of the order of sale in respect to the said plantation and negroes. On the same day the report was confirmed.

"This plantation and the twenty negroes, increased to twenty-three, remained unsold until May, 1862, when, by the request and advice of the trustees, and with the approval of the Solicitors then in the cause, I sold the said plantation at private sale, as the decree authorized, to Mr. C. O. Witte, for the sum of $7,500, and the negroes at public sale, for $7,215, as appears by my account of sales and of disbursements herewith filed, and from which it will be seen that the proceeds of said sales were paid over to Mr. Winthrop on the 16th October, 1862."

(In the above statement there was an error in this, the Long Savannah plantation was in fact sold, not at private sale, but at public auction to the highest bidder. The sale and conveyance were made June 3d, 1862, and the advertisement of sale was first inserted in the Charleston *Courier* on the 28th May, 1862, six days before the sale. Payment was made in Confederate Treasury notes.)

· His Honor the presiding Judge made a decree which, in effect, set aside the sale of the Long Savannah plantation to defendant on plaintiff paying to defendant the value in lawful money of the Confederate Treasury notes paid to the Master.

The defendant appealed on the following grounds:

1. That defendant is a *bona fide* purchaser for valuable consideration under the decree of the Court, and his title is not affected by any irregularity of the Court—1 N. & McC., 408, *Barkley* vs. *Scriven;* 1 McC., 187, *Daniel* ads. *Richards;* 1 Bail., 512, *Henry* vs. *Ferguson;* 1 Bail., 611, *Williamson* vs. *Francis;* 1 McC., 272, *Turnipseed* vs. *Hawkins;* 2 Sch. & Lef., 576, *Bennett* vs. *Hamill;* 4 Rich. Eq., 491, *Williman* vs. *Holmes.*

2. That the irregularities set forth in these proceedings must be brought up by a bill of review; they cannot be reached by a bill to set aside the decree.—Adams' Eq., 828; Story's Eq., 404; 2 Rus. C. P., 1,044; *Bennett* vs. *Winter,* 2 John. Ch., .206; *Taylor* vs. *Sharp,* 3 P. Wm., 371; *Hinson* vs. *Picket,* 1 Hill Ch., 353.

3. That the proceedings are sufficient to carry the infant's estate.—3 Stat., 707; Id., 708; 2 Story Eq., 575; 5 Strob., 7, *State* vs. *Tidewell;* 2 Keen, 185; 2 P. Wm., *Eyre* vs. *Countess of Shaftesbury;* Id, 125; 31 Eng. C. L., 681; *Rex* vs. *Isley,* 2 Fon., 247; 2 Sto. Eq., 550; Bail. Eq., 463, *Spencer* vs. *Bank;* 1 DeS., 109, *Dinke* vs. *Timrod;* Id., 115, *DeBrahm* vs. *Fenwick;* Rich. Eq. Cas., 403, *Bulow* vs. *Buckner;* 1 Rich. Eq., 361, *Pell* vs. *Ball;* 1 Johns. Ch. R., 370, *Mills* vs. *Dennis;* 6 Ves., Jr., 6, *Lord Ashburton* vs. *Lady Ashburton;* 3 DeS., 21, *Huger* vs. *Huger;* 16 Ohio S. R., *White* vs. *Turpin.*

*Phillips, Memminger,* for appellant:

1. Defendant purchased for value under decree, and is not bound to look to regularities in the proceedings.

*Barkley* vs. *Screven,* 1 N. & McC., 408, was a purchase at Sheriff's sale, where the objection was that all the intermediate executions between the first and the pluries were not produced.

*McDaniel* vs. *Richards,* 1 McC., 187, record of naturalization held to imply proof of all prerequisites, although not recited or proved.

*McNish* vs. *Guerard,* 4 Strob. Eq., 80, Court substituting a trustee, bound to presume that a conveyance was made by preceding trustee.

*Curtis* vs. *Price,* 12 Ves., 105, recites irregularities the most sub-

stantial, in the case of *Lloyd* vs. *Johns*, 9 Ves., 37, which were not allowed to affect a purchaser:

1. An account of the personalty previously ordered, which was never taken, which was a condition precedent to the application of the real estate.

2. Cause brought on for further directions on a separate report, which was never filed.

3. The decree on further directions for a sale, was to pay not only the testator's debts, but also those of one Pugh, which were no charges upon the estate.

The Lord Chancellor held that the purchaser could not be affected, although he had notice of all the proceedings, being stated in his agreement for the purchase.

*Thompson* vs. *Tolmie*, 2 Peters, 157, the law appears to be settled that Courts will go far to sustain *bona fide* titles acquired under sales made by order of Orphans' Courts. Where there has been a fair sale, the purchaser will not be bound to look beyond the decree, if the facts necessary to give the Court jurisdiction appear on the face of the proceedings.

*Williman* vs. *Holmes*, 4 Rich. Eq., 491, " the power of the Court to sell trust estates is not doubted, and when such an estate is sold under its decree, the Court is one of the contracting parties—is, in fact, the vendor. It assures the purchaser of its power to sell, and to make good titles. The purchaser thus becomes the owner of the fee, *bona fide*, and for valuable consideration. His equity is high. Would it not be hard to affect him with notice of equities, and to charge him with trusts which the Court itself has overlooked or disregarded. When the Court assumes the administration and orders a sale, it is its duty to protect the rights and interests of all parties related to the estate. If the Court omits to make the proper administrative orders, or the persons to whom the Court commits the management should prove unfaithful and the fund be lost, ought that to affect the title of the purchaser? I think not, when he pays his money into Court or into the hands of its confidential agents, that should discharge him."

*Bennett* vs. *Hamil.* 2 Sch., 8 Lefroy, 565. A purchaser, under a decree, shall not be affected by error in the decree—*e. g.*, in its not having given a day to an infant defendant to show cause, or in directing a sale of lands to satisfy a judgment without an account of the personal estate.

A purchaser has a right to presume that the Court has taken the

necessary steps to investigate the rights of the parties, and that on that investigation it has properly decreed a sale.   But he ought to see that proper parties are before the Court.—See, also, 2 Wall., 239.

II. The irregularities set forth in these proceedings can only be reached by bill of review—not by bill to set aside the decree.

What are they?   They are alleged to be:

1. Making the infants parties by their personal appearance in Court, and not by subpœna.

2. That the order of sale, under which the Master acted, was not extended.

By the prayer of Winthrop's petition, (Simons' brief, p. 2,) the Court is asked to take the case of the infants into consideration— 11th January, 1859.

February 16, 1859—Master ordered to assign a guardian *ad litem* of the infants.

February 19, 1859—The minors brought personally into Court, and mother appointed and brought personally in and consenting. She is appointed guardian *ad litem.*

March 7, 1859—Master reports that the mother and guardian *ad litem* concurs in the propriety of sale, and recommends the sale.

March 15, 1859—Order confirming report, and ordering sale.

March 13, 1860—Report sales of personalty.   Extension asked of realty.   Granted.

November 5, 1860—Further extension asked.   Same day, report confirmed, and extension implied by granting.

It seems clear, therefore, that the Court had jurisdiction of the subject, and had before it all the parties, and that the alleged errors are formal.

1. Want of subpœna and answer.

2. Want of a former order, extending the time of sale.

An infant is as much bound by a decree, as one of full age— when the infant is a party.—1 Danl. C. P., 92 ; *Gregory* vs. *Molesworth,* 3 Atk., 626.

Now, then, if these alleged errors existed in a decree against adults, how are they to be corrected ?

A decree, in this country, is considered as enrolled by filing the decree.— *Whiting* vs. *Bk. U. S.,* 13 Peters, 6 ; and in this State, 2 Hill Ch., 353, *Hinson* vs. *Pickett.*

So that all the English law, as to enrolled decrees, applies to decrees filed as usual.

3 Dan. C. P., 1724, if a party seeks to reverse an enrolled decree, he must file a bill of review.

Same, p. 1727—If decree has been signed and enrolled, so that the cause cannot be re-heard, and a party seeks to reverse the decree, the remedy is by bill of review.

So early as Lord Bacon's ordinances, it was provided that no decree should be reversed, altered or explained, being once enrolled, but upon bill of review.

*Taylor* vs. *Sharp*, 3 P. W., 371.

*Young* vs. *Keightly*, 16 Ves., 348, error apparent on the face of decree—ground only of bill of review.

*Bennet* vs. *Winter*, 2 J. C. R., 205—a final decree enrolled cannot be opened or altered but on a bill of review.

Story's Eq., p. 411.

Error in matter of form only, although apparent on the face of a decree, seems not to have been considered a sufficient ground for reversing the decree; and matter of abatement has been also treated as not being capable of being shewn for error to reverse a decree.

III. Proceedings are sufficient in any event to convey the infant's estate.

1. This case differs from any ordinary case of trusteeship, in that one of the petitioners was the testamentary guardian of the infants, and had actual possession.

After an infant is once a ward in chancery, any subsequent matter may be determined on petition or motion, and he can be made a ward by simply filing a bill, to which he is party.—Adams' Eq., 281.

The Court, *ex officio*, was bound to notice the infant's rights, and did so by ordering a guardian, and an appearance by both.

The Court accepted the appearance as sufficient, and made the infants wards of Court.

As to the formalities usual in such cases, the best evidence is to be found in C. J. Dunkin's opinion, in *Moore* vs. *Hood*, 9 Rich. Eq., 329, 330, as follows:

"Until within a few years past it was not the practice, when a guardian applied to the Court, either for instruction or for a change of his ward's personal estate, to make his ward a formal party before the Court. Latterly, he is usually made a party; and this is done by appointing the crier of the Court, or some other person, his guardian *ad litem*, who signs his formal answer submitting his rights. The appointment is commonly made by the Commissioner,

and it is very difficult for the Court to do more. After all, the proceeding is necessarily very much under the direction of the guardian. The Court, and its officer, is presumed to examine the evidence as to the expediency of the proposed change of investment—and this is equally done whether the proceeding be in the name of the guardian alone, or of the guardian and the minor suing by his *prochein ami*, (the guardian,) or by the guardian against a formal defendant, the guardian *ad litem.*"

*Bulow* vs. *Buckner*, Rich. Eq. Cas., 401, is conclusive to show that the Court of Equity has jurisdiction to sell minor's real estate. "The jurisdiction of Chancery to sell and convey an infant's estate, however questionable it may have been when first exercised, is now too firmly established to be shaken. It has been familiarly exercised ever since a Court of Chancery has existed in this State, and very many titles now depend upon it. It is in many instances an exceedingly beneficial jurisdiction, especially in this country, where land is frequently the least valuable and productive sort of property."—Per Harper Ch., 403.

In this case, the petition was on the part of the trustee and guardian, without making the children parties.

*Huger* vs. *Huger*, 3 Des., 21, in 1809, establishes the jurisdiction of the Court of Equity to sell infant's real estate—declaring that the reason for the distinction between real estate and personal property, which existed in England, did not exist here.

*Lord Ashburton* vs. *Lady Ashburton*, 6 Ves., Jr., 6, executors and trustees were directed by the will to invest in the funds for the benefit of a minor. The minor files a petition to invest in lands, and the Court, after enquiry as to the practice, allowed the change.

*Capel* vs. *Butler*, 3 Sim. & Stu., 457—If a person who is named as a defendant, but has never been served with a subpœna, or appeared to the bill, appears by counsel at the hearing and consents to be bound by the decree, the defect is cured.

*Spencer* vs. *Bank of the State*, Bail. Eq., 468.

The jurisdiction of the Court of Equity to dispose of the real estate of infants and other persons under disability, has been too long exercised to be now questioned; and a conveyance or mortgage executed by the master in pursuance of the order of the Court, which was intended to operate on the title of infants, is binding on them, if they are parties to, or represented in the proceeding in which the order is made.

*Simons*, contra :

1. That the title to the plantation was in complainants at the time of the application for sale by Messrs. Winthrop and Rose.

*Ramsay* vs. *Marsh*, 2 McC., 258 ; *Posey* vs. *Cook*, 1 Hill, 414 ; 2 Cruise Dig., Chap. VII, § 2, par. 5, 337 ; 2 Blackstone, 170, 171 ; 2 Crabbe, § 1866 ; 2 Cruise, Chap. VII, § 1, Ib. 356, Ib. 363.

2. That the complainants in the present case were not made parties to the petition of Messrs. Winthrop & Rose, and that the decree for sale thereon was not binding on them.—*Moore* vs. *Hood*, 9 Rich. Eq , 311 ; *Hull* vs. *Hull*, 2 Rich. Eq., 87 ; *Wightman* vs. *Gray*, 10 Rich. Eq., 531 ; *Sollee* vs. *Croft*, 7 Rich. Eq., 34 ; *Bailey* vs. *Boyce*, 5 Rich. Eq., 187, 193, 197 ; *Buckner* vs. *Bulow*, Rich. Eq. Cases, 404 ; 3 Danl. Ch. Pr., 1801, 2094, 2102 ; 1 Danl. Ch. Pr., 500 ; A. A., 1791, 5 Stat., 263 ; 7 Stat. 258 ; *House* vs. *Folconer*, 4 Des. 86 ; Edwards on Parties, 1 ; 2 John. Ch., 244 ; 1 Danl. Ch· Pr., 205.

3. That the sale was irregular and unwarranted by the orders in the cause, and therefore void.—*Bailey* vs. *Bailey*, 9 Rich. Eq., 394 ; *McNeill* vs. *Shaw*, 1 Phillips N. C. Eq., 91 ; A. A., 1861, Stat., 1861, 19 ; *Wardlaw* vs. *Buzzard*, 15 Rich., 162 ; *Bennet* vs. *Hamil*, 2 Sch. & Lef., 577–8.

4. In reply as to Bill of Review.—Mitford Pl., 101, 109, 110 ; *Haskell* vs. *Roul*, 1 McC. Ch., 29–30 ; *Hinson* vs. *Pickett*, 2 Hill's Ch. 351 ; *Ex Parte Vandersmissen*, 5 Rich. Eq., 519 ; *Thomlinson* vs. *Thomlinson*, 11 Rich. Eq., 52 ; Story Eq. Pl., § 426, 427 ; Cooper's Eq. Pl., 96, 98 ; Mitford Pl., 94 ; McPherson on Infants, § 6, 274 ; *Carew* vs. *Johnson*, 2 Sch. & Lef., 250 ; Lewin on Trusts, 2 Am., from 3 Lond. Ed., 1858, top mar., 597, side m., 753 ; *Goodhue* vs. *Barnwell*, Rice Eq., 238 ; *Bird* vs. *Railroad*, 8 Rich. Eq., 46 ; Code, § 92, § 190.

*Dunkin*, same side :

" Where an infant considers himself aggrieved by a decree he is not under a necessity to stay till he comes of age before he seeks redress, but may apply for that purpose as soon as he thinks fit ; neither is he bound to proceed by petition for re-hearing, or bill of review, but he may impeach the former decree by an original bill, in which it will be enough for him to say the decree was obtained by fraud or collusion, or that no day was given to shew cause against it," or that it was otherwise improper.—*Richmond* vs. *Tayleur*, 1 P. W., 337 ; Adams Eq., 420 ; Story Eq. Pl., § 427 ; *Carew* vs. *Johnson*, 2 Sch. & Lef., 292 ; *Hamilton* vs. *Hamilton*, 2 Rich. Eq.,

379; *Gordon* vs. *Sims*, 2 McC. Ch., 158; *Young* vs. *Teague*, Bail. Eq., 22, 23.

In all forensic contests between those *sui juris* and infants, the weaker parties are in peril of injury, but it is some safeguard to infants to require that they shall always be before the Court when their rights are in question, and that they shall be properly represented.—*Solee* vs. *Croft*, 7 Rich. Eq., 43.

But whatever may have been the validity of the order of sale, 15th February, 1859, it is submitted that the sale of 3d June, 1862, was not warranted, and was void for irregularity.

Last order of renewal was 5th November, 1860. Sale one year and nine months after the order of November, to wit : 3 June, 1862.

Regularly and according to the usual practice, order should be renewed at every Court.

This both from analogy to law Courts and from reason.

After expiration of year and day, plaintiff at law cannot proceed until *scire facias.* " The reason," says Mr. Tidd, 2 Tidd, 103, " is because he lyes bye so long after judgment, it shall be presumed that he had released the execution, and therefore the defendant shall not be disturbed, without being called on to shew cause why the execution should not go."—See also *Castro* vs. *United States*, 3 Wallace, 46 ; *United States* vs. *Villabolos*, recognized 6 Wallace, 356.

In analogy to this the Act of Assembly, 1784, 7 Stat., 209, provides that every suit or petition in Chancery shall be finally decided within one year unless the Court shall think proper to extend the time by continuance or otherwise.—*Bennett* vs. *Calhoun*, 9 Rich. Eq., 171.

The case was out of Court certainly in one year from November, 1860.

Sale itself was irregalar and void, because :

1. Without legal notice.

2. In fact, a private sale.—*Farr* vs. *Sims*, Rich. Eq. Cas., 131 ; *Baily* vs. *Baily*, 9 Rich. Eq., 392 ; *Martin* vs. *Wallace*, 2 Rich. Eq., 373 ; *Wightman* vs. *Gray*, 10 Rich. Eq., 531; Rule of Court of Appeals, March, 1840, Miller's Compil., 59.

April 16, 1872. The opinion of the Court was delivered by

Moses, C. J. We are without the benefit of the views which induced the conclusion of the Circuit Judge, which the motion here seeks to reverse.

The bill before him prayed relief against the order of the Court

of Equity under the petition of the said J. A. Winthrop and A. G. Rose, so far as it directed the sale of the plantation called Long Savannah, claimed by the plaintiffs under the will of their grandfather, John Joachim Bulow. "Regarding the proceedings which led to the decree as at least irregular, and the sale not in accordance with the spirit or letter of the decree," and assuming that the prayer of the bill authorized him to declare the order erroneous under the Act of March 16, 1869, 14 Stat., 214, he required its amendment "in conformity with his opinion," and decreed a restitution and delivery of the premises to the plaintiff with the muniments of title therefor, on their returning to the defendant the purchase money in United States currency, in the proportion which it bore in value to Confederate money at the date of the sale.

On discovering, by a consideration of the plea filed to the said amendment, that he had committed error in holding that the provisions of the said Act applied to the case before him, he vacated his order for amendment, leaving in force his decretal order which in effect sets aside the sale by the Master, and we are to infer from the argument here, that it rested on the following propositions:

First. That the children (the plaintiffs) were not properly parties to the petition of Joseph A. Winthrop and Arthur G. Rose, filed on the 11th February, 1859; and, therefore, not estopped by the order made under it; and, second, That the sale was irregular, unwarranted by the orders in the cause, and, therefore, void.

We do not think it of consequence to determine what interest the children of Thomas S. Bulow, who are the plaintiffs here, took under the will of their grandfather, John Joachim Bulow, in the Long Savannah lands. Whether the legal title vested in them by the force of the devise, or whether the use not being executed, it remained in the said Winthrop and Rose as their trustees, they had at least such a beneficial interest in the estate, as could not be disposed of by the Court through any proceedings to which they were not parties. "Upon the general principles of Courts of Equity, there would be an impropriety in binding either the legal or the equitable claimants unless they were fully represented and permitted to assert their rights before the Court; and, if not bound, the decree would not be final on the matter litigated."—Story Eq., § 208. It is, however, worthy of notice and regard, that in the cause in which the order for sale was made, the petitioners were recognized by the Court as "trustees." Not only are they so styled in the petition, and in the report of the Master, but, in the order of Chancel-

lor Wardlaw, of 15th March, 1850, the proceeds of the sale are directed "to be invested in the name of Joseph A. Winthrop and Arthur G. Rose, trustees for the infants, Thomas Lionel Bulow and J. Charles Bulow, as devisees under the will of their grandfather, the said John Joachim Bulow." It would appear from this that the judicial construction of the words of the will as to the interests of the petitioners recognized the legal right in them, while the beneficial use was in the children.

On the 13th of March, 1860, the Master reported the sale of one hundred and seventy negroes under the order of March 15, 1859, and "that he had paid to Joseph A. Winthrop $52,520, and he had, under his direction, invested the sum in city 6 per cent. stock, in the name of himself and Arthur G. Rose, Trustees of Thomas L. and J. Charles Bulow, as directed by the decree." On the same day, the order was confirmed by Chancellor Inglis. On November 6, 1860, a detailed report of all the sales was made, and a payment of $106,201.02 in cash, stocks, and so forth "to the trustees," and this report was confirmed by Chancellor Carroll as soon as presented. ·

Under the bill filed on 26th of March, 1866, by the said Thomas Lionel Bulow against A. G. Rose (survivor of the said Winthrop) and the said John Charles Bulow, among other matters, for an account of the rents and profits of the said plantation, the fact of the sale came to the knowledge of the parties by the report of the Master on the 13th day of March, 1867, and on the 16th day of the same month it was adjudged in an order, manifestly taken by counsel in the interests of the plaintiffs here, "that the said Arthur G. Rose had fully accounted as executor and trustee under the will of the said John Joachim Bulow, and that he be absolutely acquitted, &c., from any further account, &c., as executor or trustee, saving, and so forth." It would thus appear that until the filing of the bill which was the origin of the proceedings now before us, that whenever the said Winthrop and Rose were before the Court connected with the said devise, the representative character which they assumed as trustees was recognized.

If Chancellor Wardlaw granted the order on the motion of the petitioners, because he regarded the legal title to the property as in them, and if he therein erred, his error of judgment would constitute no ground for now holding the order void. If the Court had jurisdiction over the subject-matter and the parties, and all who were to be affected by its judgment were before it as parties, then its order is legal, binding and final.

It is not disputed that the Court of Chancery has the power to sell and convey the estate of an infant. However doubtful it may at one time have been considered, "it is now too firmly established to be shaken."—*Bulow* vs. *Buckner*, Rich. Eq. Cas., 401. In fact, the authority has not been questioned in the case before us. The exercise of this jurisdiction, through the process of petition, however originating, has been sanctioned and confirmed by long established practice; and the right of the Court in this respect is no more to be disputed than its right to order the sale of property for investment under the more expensive procedure, by bill. Whether Winthrop and Rose are to be regarded as seized of the legal estate, or only as executors of the will, holding possession for the benefit of the infants, and either as such executors, or through Winthrop, as guardian, in the control and direction of the property, they were the parties petitioners, and it was for the Court to determine, not only as to the propriety of the prayer which they submitted, but whether, on a proceeding to which alone they were parties, the relief sought could be obtained. It appeared that, on considering the petition, the Chancellor was of opinion that the children were proper and necessary parties. He, accordingly, referred it to the Master " to assign a guardian *ad litem* to the infants, Thomas Leonel Bulow and John Charles Bulow, to appear to this petition ;" and under the authority of the order, their mother, Mrs. Caroline Bulow, at their selection, was appointed. The required formalities in such cases were complied with. The petition was referred to the Master, who reported on the facts, and recommended a sale of the negroes and land as manifestly for the interest of the children. In this opinion, according to the report, the *guardian ad litem* concurred. It remains now to be considered whether these infants were parties to the proceeding, and, therefore, estopped from averring against the validity of the judgment rendered upon it.

What is the object to be secured by assigning a *guardian ad litem* to infants interested in a matter before the Court ? It is identical with that to be accomplished by the service of a subpœna on an infant in the nurse's arms. It is to attract the attention of its friends, that a due regard may be had to its rights, and that the mind of the Court may be directed to them. Is this end in any way more effectually attained by the filing of a formal answer on the part of the *guardian ad litem*, than by bringing to the notice of the Court the facts upon which its judgment is to be exercised in disposing of the rights and interests of the infants involved in the matter before it ?

An infant before the Court stands in the same relation to it as does one of its own wards. "Whenever a suit is instituted in the Court of Chancery relative to the person or property of an infant, although he is not under any general guardian, appointed by the Court, he is treated as a ward of the Court, and as being under its special cognizance and protection."—Story Eq., § 1352.

Whenever the rights of others are sought to be enforced against an infant by a judicial proceeding, the Court first attempts to secure him full means of defence by the appointment of a *guardian ad litem*, who occupies the same relation (if not a more immediate and direct one) to the infant, as the *prochein ami* does, who is appointed to protect the interests of a minor seeking redress against others for a violation of his rights. Parke, B., says, in *Morgan* vs. *Thorn*, 7 M. & W., 408: "It is perfectly clear that every *prochein ami* is to be considered as an officer of the Court, specially appointed by it to look after the interests of the infant, on whom the judgment is consequently binding, and who cannot be allowed, on attaining his age, to commence fresh proceedings founded on the same cause of action."

The argument of the counsel for the appellee, exhibiting much research and learning, has been conclusive to shew that minors cannot be affected by judicial proceedings, unless it appears that they were parties before the Court. But what requisitions must be complied with to make them parties has not been prescribed in any of the cases referred to. The answer on their behalf by a person not appointed *guardian ad litem*, will be disregarded.—*Bailey* vs. *Boyce*, 5 Rich. Eq., 197. So it would appear that though brought into Court by service, and an answer filed by a party not *guardian ad litem*, the infant would not be bound. Is it not apparent that the Court regarded the appointment of some one authorized and in duty required to look after the interests of the minor, as indispensable to the validity of its decree against him? We are not to be understood as laying down any general rule as to what may be necessary to bind an infant as a party defendant to a cause. Our inquiry is limited to the question, whether these infants were so parties to the petition that they are precluded from now averring against the judgment pronounced under it.

The petition claimed no rights against the infants. It created no contest putting them in an antagonistic position to the petitioner. Its whole scope was to present to the view of the Court the condition of the property, and, from the experience of the past, the like-

lihood that it would not be productive or remunerative if continued as a planting investment. It prayed that " the case of the infants, as well as of the petitioners," might be taken into consideration, and the sale of the whole, or a part of the property, sanctioned. It at once occurred to the Chancellor, that with the parties then alone before him, he could not consider the subject-matter of the petition, as it involved rights in which the grand-children of the devisor were interested. The object of the order was to make them parties, and to bring them before the Court by the appointment of a guardian *ad litem*. Recognizing them as before him, he ordered the reference; required " a report upon the facts," to ascertain " whether it is for the advantage of the infants that the real and personal estate referred to in the petition be sold." When it appears by the fact of the appointment of such guardian, her acceptance and concurrence in the recommendation of the Master, that the Chancellor passed upon the petition with all proper reference and security to the rights and interests of the infants, is it to be said that there is still something more which is necessary to bind them? The barren form of the service of a subpœna, the purpose of which the infants are supposed not to understand, and the answer of the *guardian ad litem* which does not bind them, these, it is alleged, are still necessary to give validity to the order. As was said by Chancellor Kent, in *Mills* vs. *Dennis*, 3 John. Ch., 368, " a decree cannot safely be obtained against an infant upon the mere fact of taking the bill *pro confesso*, or upon an answer in form by the *guardian ad litem*." The answer in such cases generally is that the infant knows nothing of the matter, and, therefore, neither admits nor denies the charges, but leaves the plaintiff to prove them as he shall be advised, and throws himself on the protection of the Court. If we stretch the obligation of purchasers at judicial sales beyond the mere duty of ascertaining whether the Court had jurisdiction in the matter in which it claimed to act, and whether all the parties to be bound are before it, in the language of Lord Redesdale in *Bennett* vs. *Hamill*, 2 S. and L., 577, " we shall introduce doubt on sales under the authority of the Court, which would be highly mischievous." Something is certainly due to the purchasers at these sales from the confidence which the public reposes in the judgments of the Courts of the country. They must be upheld, at least so far as they operate on the title of parties to the proceeding, and if the title, though of infants, is thus alienated by the sale, the conveyance of the officers of the Court operates as an estoppel to the same extent, and in the

same manner, that the proper deed of an adult conveying his title would bar.him from asserting it against his grantee. Regarding the plaintiffs as parties to the petition, and bound by the judgment of the.Court directing the sale, we are next to consider the further ground upon which it was endeavored to sustain the decree of the Circuit Judge, now under review.. That proceeds upon the affirmation " that the sale was irregular, unwarranted and void."

The order was made 15th March, 1859, and it directed the Master " to sell, at such time and place, and on such terms, as he, with the advice of the trustees, might approve." It did not require the Master to consult with the *guardian ad litem*, as to the time or condition of the sale, and his failure to do so could not be regarded even as an irregularity.

On 13th March, 1860, an extension was ordered, and again on the 5th November, 1860. On 3rd June, 1862, without any intermediate proceeding, the sale was had.

It is urged that the order contemplated the payment of the purchase money in gold and silver coin or its equivalent, and the sale being made at a time when such currency was expelled from the country by the existence of the war, and the acceptance of payment in a depreciated medium, so varied the conditions as to render it absolutely void.

It should not be forgotten that the question here is between these plaintiffs and the purchaser, not the plaintiffs and the Master. Whatever rights and equities they may have against him, cannot be interposed to the prejudice of the purchaser, if there was authority in the Master to make the sale. If it was an existing order of a Court having jurisdiction over the subject-matter, and the parties whose interests its judgment was intended to affect, no subsequent irregularity on the part of the officer charged with the sale can destroy the validity. No fraud is alleged against the purchaser, and no collusion with the Master. In addition to the careful consideration. of the propositions contended for on the part of the appellees, we have examined, with much attention, the authorities referred to on this point, in the argument of a case at this Term, depending to a large extent upon the application of the same rules and principles by which this must be governed, and find nothing in them to sustain the position, that the change made in the order, by selling at a time when a depreciated currency was in existence, so affected it as to render it void. *U. S.* vs. *Slade*, 2 Mason, 75, turned upon the fact that the statutory power on

which alone the title depended, was not apparent on the record, and further, that the appraisement was concurred in only by two of the appraisers, and the non-concurrence of the third not explained. *Thatcher* vs. *Powell*, 6 Wheatcn, 119, proceeded upon the ground that where a Court exercises extraordinary powers under a special Statute, the course it directs must be pursued, and the facts that give it jurisdiction must appear on the record, otherwise the proceedings are void, because *non coram judice*. *Bigelow* vs. *Forrest*, 9 Wall., 351, held that the decree of the Court only operated on and extended to the interest of Forrest in the property for life—that the Court had no power to order a sale of the fee simple; and it was the duty of the purchaser to look at the decree " and they were bound to know its legal effect." The language of Chancellor Wardlaw in *Whiteman* vs. *Gray*, 10 Rich. Eq., 531, may well be repeated in this connection : " The action of the Court never proposed to bind parties beyond the legitimate interpretation of its orders and decrees, and not at all to conclude the titles of third persons who are not parties."

That the order contemplated such currency as could be readily convertible into coin, might be admitted; and yet the sale, as against the purchaser, would not be void, because the payment required was received by the Master in a depreciated currency, which, at the time, was the only circulating medium prevailing in the country.

The principles sustained by the Court in *Ward* vs. *Smith*, 7 Wallace, 447, are restrained in their application to the case before us by the decision of the Appeal Court in *McPherson* vs. *Gray*, 13 Rich. Eq., 130. The bill there sought to annul a settlement made between Mr. Gray, the Master, and the purchaser of the bonds given for the purchase money of the lands sold by the order of the Court, and to set up the bonds and mortgage, or make the Master liable, on the ground that the bonds were executed when gold or silver coin was the only currency, while their payment was received in Confederate Treasury notes. The Court, so far from enforcing the instruments as existing obligations, held " that the Act of the Master was entitled to its sanction," and did not even ·make him liable for the difference between the value of the Confederate money he accepted and United States currency. We are not prepared to say that the case, in all its aspects and bearings, meets our concurrence, but, standing as an authority not sought to be impugned by the mode authorized by the Court, we must so regard and respect it.

If the purchaser there was entitled to hold, under all the circumstances which attended the reception of the money as payment of the mortgage, it is in vain to say that the title of the purchaser here is void, because the Master received the purchase money in a currency different from and less valued than that in circulation at the time that the order for sale was made.

Although the advertising of sales by Sheriffs is regulated and fixed by statute, there is no Act of the Legislature or rule of Court prescribing what public notice shall precede a sale made by the Master or Commissioner under an order of the Court of Equity. Where the order requires notice for a certain time, it forms one of the conditions on which the authority is to attach. The manner of the execution of the power is then fixed by law, and if defectively performed, cannot be relieved by a Court of Equity. It has been the practice, in analogy to Sheriff's sales of real estate, to pursue the notice there required. In the absence of all Statute requisition, a failure to do so cannot vitiate the sale unless fraud has been practiced, or some design intended against the interest of those on whose behalf the sale is ordered.

Neither can the failure to renew the order within a year and a day be held to affect the sale. The order of the Court, of 15th March, 1859, extended by that of 5th November, 1860, stood as the direction and authority of the Court. The principle which forbids procedure at law, after a year and a day, has no application to the Court of Equity. There the presumption on which it is formed can seldom exist. To admit the application to the practice in the Courts of Equity of this State, would be in singular inconsistency with the construction which was given in *Jeanerett* vs. *Redford*, Rich. Eq. Cases, 470, to the Acts of 1784, 1789 and 1810. In regard to suits in that jurisdiction, "under this Act," said the Court, "no doubt a defendant may have a bill dismissed at the end of three years after a decretal order made, whatever cause may be shown for a further continuance. But the uniform practice has shown that the cause is not *ipso facto* out of Court if such motion be not made." The Chancellor, delivering the opinion of the Court in *Bennett* vs. *Calhoun Association*, 9 Rich. Eq., 178, says: "This Court is well satisfied with the observation of Chancellor Harper, in *Jeanerett* vs. *Redford*, that, according to the uniform practice of the Court, the cause is not regarded as *ipso facto* out of Court, although these directions may not have been strictly observed."

It is further contended that the 4th Section of the Act of Decem-

ber 21st, 1861, 13 Stat., 19, commonly known as the Stay Law, suspended the operation of the order for sale until renewed, and as it never was renewed, that the sale under it was utterly null and void. It is not proposed to examine, by any close investigation, whether the said Section of the Act is within the legitimate power of the Legislature. If its design had been to establish a new rule or direction for the government of the Court in future orders for the sale of property, it would not have been an encroachment on the exclusive powers of the judicial department of the government. If, however, the practical result of its operation is to annex new conditions to the orders of the Court already pronounced, and thereby change or modify its judgment as therein declared and expressed, it is an assumption of the powers which pertain to another and independent department of the government. Neither is it proposed to inquire, conceding that one part of an Act may be unconstitutional, and yet all the other portions of it not obnoxious to that objection, whether the 4th Section is not to be taken in connection with the first as forming part of a system by which final decrees in equity, as well as final process at law, were to be inoperative unless permitted to have effect through renewal by a Judge of the Court which had ordered it, and thus assuming in such enactment a power not properly within the competence of legislative authority.

The Act stays the sale authorized by the order until the same shall be renewed by one of the Judges of the Court which originally granted it.

The judgment, then, of the Chancellor which, at the passage of the Act, was final and conclusive, becomes inoperative until renewed by another Chancellor. If not renewed, the object which the judgment was to accomplish can never be obtained, and its whole purpose is defeated.

We cannot regard the Section as of such mandatory force as to render the sale made in disregard of its requirements void, and conferring no rights on the purchaser. If there were no irregularities in the sale amounting to defects, while the Master may be subject to the animadversion of the Court, and liable to the plaintiffs for any loss which ensued from his neglect of observances intended for their benefit and protection, as against the purchaser, the sale cannot be decreed void.

The interference of the Court is invoked on behalf of these plaintiffs, who, it is said, were unable to protect themselves on the application under the petition, by reason of their infancy, and its power

is claimed to set aside the title of the purchaser both on principles of law and equity. All the propositions of law on which they rested have been solved against them, and the general aspect of their case does not recommend it so favorably to considerations of equity that by the application of the rules which govern its administration, the prayer of their bill can be favorably answered.

Through the order for the sale, which they aver was not binding on them, the negroes which they would otherwise have lost, were converted into stocks and securities, of which they have received the benefit, and it must be held to have been recognized by them as valid, by the order of the 16th March, 1867, in the case of *Thos. L. Bulow* vs. *Rose and John Charles Bulow*, which directed the payment of the said stocks and securities for the use and benefit of these very plaintiffs—nay, on the same day that the Long Savannah land was sold, twenty-three negroes were also disposed of by the Master, and the proceeds paid over to Winthrop and Rose, as trustees. These proceeds were included in the funds for which Rose was to account by said order, which also declares that he had accounted, as executor and trustee, under the will of John Joachim Bulow, and on "paying, assigning and transfering the funds, stocks, bonds and securities, in his hands, as he was directed, that he be absolutely acquitted, exonerated and discharged from any further account as executor aforesaid," saving and reserving the rights and equities to these plaintiffs to test the sale of the Long Savannah plantation, or the rights of the purchaser thereto, the proceeds of which sale had been paid by the Master to Rose and Winthrop, on the 16th October, 1862, and by the said order were directed to be delivered to the Master "to remain until the further order of the Court." Whether Winthrop and Rose were express trustees under the will, or whether, as intermeddling with the property, they became, as to the children, voluntary trustees, by the order of the Court they, with the Master, were to fix the time, place and terms of the sale. The plaintiffs, so far from asserting any claim against the said Winthrop and Rose, by reason of their action in the matter of the sale of the land actually by the order above referred to, discharge the said Rose, who was the survivor of Winthrop and Rose, and declare that he was not to be "held liable for any miscarriage in relation thereto." If they have rights against the said parties they have surrendered them by the discharge. If they have any against the Master, they have not pursued them, while they seek redress of the purchaser against whom they aver no fraud or wrong design,

and who certainly is as innocent as either of the parties who fixed the time, place and terms of the sale.

It appears difficult to reconcile the claim now preferred with any of the recognized principles admitted by Courts of Equity, even in favor of infants.

It is ordered and adjudged that the motion be granted, and the bill dismissed.

*Willard*, A. J., and *Wright*, A. J., concurred.